IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Raymond Soto *et al.*, )
)
Plaintiffs, )
) Civil Action No.: 10 C 3602
v. )
) Suzanne B. Conlon, Judge
The City of West Chicago *et al.*, )
)
Defendants. )

**MEMORANDUM OPINION AND ORDER**

Raymond Soto ("Soto") and R.C. Soto & Soto, Inc. ("the company") filed a § 1983 action against The City of West Chicago, Joanne Kalchbrenner, Alderman James Beifuss, Alderman Ruben Pineda and Alderman Lori Chassee under the Equal Protection Clause of the Fourteenth Amendment and the Fair Housing Act of 1984, 42 U.S.C. § 3604(a). Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted.

**BACKGROUND**

The following facts are derived from the plaintiffs' complaint. On May 10, 1999, Paul Barmantje, a city inspector, asked Soto, a United States citizen of Mexican descent, whether he was housing a Hispanic family at a home his company built at 427 Ann Street, West Chicago, Illinois. Compl. at ¶¶ 1, 11. At Barmantje's request, Soto showed Barmantje that no "Mexicans" were living in the garage. *Id.* at ¶ 12. Soto complained to the city about Barmantje's treatment of him but did not receive a reply. *Id.* at ¶ 13. In July 1999, Soto was constructing a home at 421 George Street, West Chicago, Illinois, when Alderman Baxter harassed him. *Id.* at ¶ 14. In

response to learning of Alderman Baxter's harassment, Mike Baker, a city assistant community development director, stated, "I know but she's an Alderwoman." *Id.* After a Hispanic family moved into the home at 421 George Street, the city harassed the homeowners and entered the home based on claims of overcrowding. *Id.* at ¶ 15. A suit filed by the homeowners in this court against the city was settled. *Id.*

On February 1, 2000, Soto purchased a corner lot at 111 Brown St., West Chicago, Illinois for $35,000. *Id.* at ¶ 16. After submitting building plans, the city informed him that corner yard setback rules had changed since the last time he built a home on a city corner lot. *Id.* at ¶¶ 16-17. Soto incurred additional costs to redesign the home. *Id.* at ¶ 17. On August 1, 2001, Soto purchased a corner lot at 111 Pomeroy Street, West Chicago, Illinois for $36,000, and submitted plans to the city identical to those used to build the 111 Brown Street home. *Id.* at ¶ 18. The city notified him that the ordinance delineating corner lots had changed, and he incurred additional costs to alter the designs. *Id.* at ¶ 19.

On March 1, 2003, Soto learned of an opportunity to purchase a vacant lot at 872 Sterling Avenue, West Chicago, Illinois and met with Kalchbrenner, the city's director of community development, regarding plans for building a home there for a Hispanic customer. *Id.* at ¶ 20. Kalchbrenner told him that his plans complied with applicable zoning ordinances. *Id.* at ¶ 21. After learning of another interested buyer, Soto purchased the vacant lot for $55,000, relying on Kalchbrenner's prior assurances. *Id.* at ¶ 22. When he applied for a building permit, Soto was advised that his plans for the vacant lot were unacceptable. *Id.* at ¶ 23. On June 15, 2006, Soto filed a variance application seeking to reduce the lot width from '75 to '60.78 feet and the lot area from 9,000 to 8005.8 square feet. *Id.* at ¶ 31; Exh. E. On September 19, 2006, the city Plan

Commission/Zoning Board of Appeals held a hearing on the requested variance. *Id.* at ¶ 32; Exh. F. During the hearing, Beifuss and adjacent property owners stated that if the variance were granted, property values and the character of the neighborhood would be negatively impacted. *Id.* at ¶¶ 37-39; Exhs. J, K. A petition with approximately 70 signatures and other statements opposing the variance were also submitted. *Id.* at ¶ 33; Exh. G. On September 26, 2006, during a special development committee meeting, Kalchbrenner admitted making a mistake regarding the assurances she gave Soto. *Id.* at Exh. K. At the November 13, 2006 development committee meeting, the variance request was denied. *Id.* at ¶ 40; Exh. L. Soto contends that a similarly situated neighbor not part of a protected class was permitted to purchase property in violation of Zoning Ordinance 8.5, governing vacant lots. *Id.* at ¶¶ 34-35, 38-39.

In June 2004, Dan Johnson, a city inspector, instructed Soto to widen a sidewalk in front of several recently-constructed homes from four to five feet. *Id.* at ¶ 24. When Johnson inspected the sidewalk, he advised Soto that the sidewalk needed to be replaced with one that was four feet wide, involving a cost of $12,000. *Id.* at ¶ 25. On May 5, 2005, while conducting an inspection, Barmantje measured individual room sizes in one of Soto's homes because the city believed Soto was contributing to overcrowding. *Id.* at ¶ 26. During this inspection, Barmantje asked Soto whether his company only built homes for Hispanics, and if he had received a grant to form his business. *Id.*

On August 3, 2005, Soto learned the city instructed Kalchbrenner not to review any of his 25 other projects pending in the city, due to a gas pipeline issue beneath one of his properties. *Id.* at ¶¶ 27-28. In an email to Jeff Harris, a city planner, Soto stated, "[y]our refusal to review, approve or act on all ongoing projects that I have in West Chicago have effectively shut down my

company. . . . I know of no other example of the city shutting down all operations of an owner or company because a single project or location had unresolved issues. This selective and arbitrary penalty is unfair and is causing hardships to my employees and my company." *Id.* at Exh. D.[1] Soto delayed work on his projects until spring 2006; during this time, he lost customers and subcontractors and laid off workers. *Id.* at ¶¶ 29-30. Soto also paid $115,000 in interest and $18,000 in taxes on the lots, and lost sales contracts on six properties, totaling more than $410,000 in lost profits. *Id.* at ¶ 30.

In October 2007, Soto was involved in the construction of the "Bishops Place" subdivision in the city. *Id.* at ¶ 41. Denny Simms, a city civil engineer, told Soto that he was required to add monolithic window wells to the homes in the subdivision because DuPage County required those wells for 100-year flood plains. *Id.* at ¶¶ 41, 44. Soto was not previously required to install monolithic window wells in city homes, and he received approval of his subdivision plans without the window wells. *Id.* at ¶¶ 42-43. After Kalchbrenner stated he would be required to comply, Soto spent $1,500 re-drafting the plans and $18,000 installing the monolithic window wells. *Id.* at ¶¶ at 45-46.

On February 27, 2008, due to suspected overcrowding, the city advised Soto of its intention to inspect the property at 139 West Stimmel Street. *Id.* at ¶ 47 (citing Exh. N). The city discovered no overcrowding during its inspection. *Id.* Three months later, after constructing a home at 268 Augusta Street, Soto contacted the city to have the driveway inspected. *Id.* at ¶ 48. He learned that Kalchbrenner was out of the office and had left instructions that none of Soto's

---

[1] Exhibits attached to the complaint are part of the pleading for all purposes and may be reviewed when considering a motion to dismiss. Fed. R. Civ. P. 10(c); *Thompson v. Illinois Dep't of Professional Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).

4

properties under construction were to be inspected. *Id.* Soto emailed Mayor Michael Kwasman regarding the issue, and Kwasman ordered that the property's inspection occur the next day. *Id.* at ¶ 49 (citing Exh. O).

On March 20, 2009, Doug Nooden, a city assistant engineer, advised Soto that he would need to submit plans indicating the location of gas service for his property located at 1216 Bishop Street. *Id.* at ¶ 50. Though not previously requested for 40 other projects, Soto submitted four separate plans, incurred additional surveyor fees, suffered a four-month delay in constructing the home, and lost the contracted buyer. *Id.* at ¶¶ 51-52. About two months later, Soto attended a ribbon cutting ceremony for a new restaurant in the city. *Id.* at ¶ 53. While walking past Soto's table, Pineda stated to Chassee, "I didn't know they allowed Mexicans in here." *Id.* at ¶ 54. Both Pineda and Chassee laughed as they walked past, causing Soto mental anguish and embarrassment. *Id.*

On May 1, 2009, Soto received notices of violation for failing to maintain grass and weed levels below eight inches on six of his properties. *Id.* at ¶ 56. Two nearby properties, where grass and weeds had grown approximately four feet high, were not among the cited properties. *Id.* at ¶ 56. After receiving the notices, Soto contacted John Fincham, a city assistant community development director, and Fincham agreed to notify him if a similar, future violation occurred. *Id.* at ¶ 57. On September 11, 2009, Fincham warned Soto via email that the same six properties were in need of mowing. *Id.* at ¶ 58 (citing Exh. P). Although Soto advised Fincham that the properties would be mowed by September 14, 2009, the city mowed the lots on September 13, 2009. *Id.* On September 21, 2009, Soto received invoices from the city demanding payment in the amount of $1,170 for mowing the six lots. *Id.* at ¶ 59; Exh. P. Soto contends that the city

5

treats similarly situated contractors who are not members of a protected class differently concerning mowing violations. *Id.* at ¶ 60.

In Count I of the complaint, Soto and his company contend the city, Kalchbrenner, Beifuss, Pineda and Chassee denied Soto equal protection of the laws for over a decade through a pattern of conduct, including harassing him, refusing to allow him to build homes for minorities based upon previously approved plans, refusing to review his active projects, enforcing zoning ordinances and issuing violations against him differently than others, and publicly humiliating him through discriminatory comments. *Id.* at ¶ 62. In Count II, Soto and his company assert that the city, Kalchbrenner and Beifuss violated the Fair Housing Act by taking actions as a result of Soto's national origin that made it "virtually impossible" to build housing for Hispanic residents in the city. *Id.* at ¶¶ 74-76. Plaintiffs did not specify which of the incidents between May 10, 1999 and September 21, 2009, they believed were Fair Housing Act violations. Soto and the company seek damages of at least $1,000,000, an injunction from further discrimination and harassment, and an award of punitive damages and attorneys' fees.

Defendants move to dismiss asserting the doctrine of absolute legislative immunity applies to Beifuss, Pineda and Chassee; the two-year statute of limitations precludes Soto's claims based on events prior to June 10, 2008; the complaint fails to state a claim upon which relief may be granted; the "official capacity" claims are duplicative of the claims against the city; and the city is immune from punitive damages in a § 1983 suit. In their limited response, Soto and his company only address the absolute legislative immunity argument relating to Pineda's discriminatory statements and the applicability of the two-year statute of limitations.

## ANALYSIS

### I. Legal Standard

In considering a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, – U.S. –, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). The plausibility standard is met if facts are pled that allow the court to reasonably infer the defendants' liability for the alleged misconduct; a possible, speculative or conceivable claim is insufficient. *Id; Bissessur v. The Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009). All reasonable inferences are to be drawn in favor of Soto and his company. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

### II. Absolute Legislative Immunity

Beifuss, Pineda and Chassee contend they have absolute legislative immunity and should be dismissed as defendants. Local legislators are immune from § 1983 liability for their legislative activities. *Bogan v. Scott-Harris*, 523 U.S. 44, 49, 55-56, 118 S. Ct. 966, 970, 973, 140 L. Ed. 2d 79 (1998) (voting for an ordinance, introducing a budget and signing the budget into law were legislative acts). Legislative immunity is limited in nature, including when legislators spoke at, or subpoenaed records for use, in a legislative hearing or voted on a resolution. *Biblia Abierta v. Banks*, 129 F.3d 899, 903 (7th Cir. 1997); *Hansen v. Bennett*, 948 F.2d 397, 402 (7th Cir. 1991), *cert. denied*, 504 U.S. 910, 112 S Ct. 1939, 118 L. Ed. 2d 545 (1992). Legislative immunity "does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not *a part of the legislative process itself.*" *Hansen*,

7

948 F.2d at 402 (emphasis in original) (quoting *United States v. Brewster*, 408 U.S. 501, 528, 92 S. Ct. 2531, 2545, 33 L. Ed. 2d 507 (1972)). In *Hansen*, the Seventh Circuit found that ejecting a citizen from a city council meeting that was open to public participation was not a legislative activity.

Soto's only allegation against Beifuss concerns his statement that the variance Soto sought would negatively impact property values and the character of the neighborhood. In the motion to dismiss, Beifuss, Pineda and Chassee independently raise their votes to deny Soto's variance and contend their actions were legislative in nature.[2] Introducing and voting to pass a rezoning ordinance are legislative activities that are entitled to absolute immunity. *Biblia Abierta*, 129 F.3d at 904-05. "Administrative or executive acts of legislators are not protected." *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988) (though acknowledging employment decisions are generally administrative, eliminating jobs through city budget process was legislative). At the open zoning board and development committee meetings, Beifuss, Pineda and Chassee did not vote on legislation or engage in policy making; they acted administratively in denying Soto a variance. Unlike *Biblia Abierta*, their vote did not establish "neutral, prospective rules that apply to all current and future owners of the property." *Biblia Abierta*, 129 F.3d at 904. Similarly, Pineda's racially derogatory statement, "I didn't know they allowed Mexicans in here," and Chassee's laughter in response, were not legislative. Accordingly,

---

[2] Beifuss, Pineda and Chassee also state that Soto seeks relief concerning votes to change the city's setback ordinances. There is no record evidence that Beifuss, Pineda and Chassee were involved in these votes, and the complaint's allegations regarding ordinance changes are only against the city. Compl. at ¶¶ 17, 19, 41-44, 50-52.

8

Beifuss, Pineda and Chassee are not entitled to absolute legislative immunity for the foregoing acts.

### III. Incidents Outside Statute of Limitations Period

To support their Equal Protection Clause and Fair Housing Act claims, Soto and his company allege a series of incidents between May 10, 1999 and September 21, 2009. The city, Kalchbrenner, Beifuss, Pineda and Chassee contend the incidents prior to June 10, 2008, are barred by the two-year statute of limitations. *Jenkins v. Village of Maywood*, 506 F.3d 622, 623 (7th Cir. 2007) (Illinois' two-year statute of limitations for personal injury actions is applicable to § 1983 claims); *McGee v. Snyder*, 326 Ill. App. 3d 343, 352, 760 N.E.2d 982, 990 (Ill. App. Ct. 2001); 42 U.S.C. § 3613 (in Fair Housing Act cases, statute of limitations is two years). While agreeing that the two-year statute of limitations applies, Soto and his company counter that the incidents constitute a continuing violation that tolled the statute of limitations.

Under Illinois law, if a tort involves a continuing injury, the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease. *McGee,* 326 Ill. App. 3d at 352, 760 N.E.2d at 990 (because monthly denial of compensatory good conduct credits was a continuing course of conduct, the statute of limitations did not begin to run until the last denial of credits); *Roark v. Macoupin Creek Drainage District*, 316 Ill. App. 3d 835, 847, 738 N.E.2d 574, 584-85 (Ill. App. Ct. 2000) (drainage district commissioner's ongoing failure to maintain drain system constituted a recurring injury, tolling the statute of limitations until the date of the last injury), *appeal denied*, 194 Ill.2d 581, 747 N.E.2d 357 (Ill. 2001). The Seventh Circuit has recognized workplace harassment on grounds of sex to be a typical example of a continuing violation case. *Limestone Dev. Corp. v. Village of Lemont, Illinois*, 520 F.3d 797, 801 (7th Cir.

2008). The first offensive act may not rise to the level of harassment; the cumulative effect of the harassing acts may be required for the plaintiff to know that an actionable claim exists. *Id.*

The continuing violation doctrine is inapplicable when the injury is definite, discoverable and redressable. *Wilson v. Giesen*, 956 F.2d 738, 740, 743 (7th Cir. 1992) ("[c]ivil rights claims... accrue when the plaintiff knows or should know that his or constitutional rights have been violated"); *Dasgupta v. Univ. of Wisconsin Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997) (a continuing violation exists if "its character as a violation did not become clear until it was repeated during the limitations period"). In *Dasgupta*, the plaintiff alleged that between 1974 and 1987, due to his national origin, the university paid him lower compensation than his peers and failed to protect him from harassment by other members of the faculty. *Id.* Finding no continuing violation to toll the statute of limitations, the Seventh Circuit stated, "Dasgupta's failure to bring such a suit cannot be ascribed to the ambiguous or incomplete nature of the discrimination-to his being the victim of a campaign whose discriminatory character was not apparent at the time." *Id.* at 1139-1140.

Unlike *McGee* and *Roark* that involved the same repeated injury (denial of good conduct credits and failure to maintain a drain system, respectively), Soto sustained separate, distinct alleged injuries between May 10, 1999 and September 21, 2009. As early as July 1999, he discovered that his injuries may have been based upon his national origin and knew discrimination injuries were redressable. Soto contends Alderman Baxter harassed him in July 1999, and the city failed to take any action. Compl. at ¶ 14. He then learned that the Hispanic owners of a home he built were harassed by the city on claims of overcrowding; they filed a discrimination suit and settled the case. *Id.* at ¶ 15. Similarly, the city inspected two of Soto's

10

homes in May 2005 and February 2008, due to suspicions of overcrowding. *Id.* at ¶¶ 26, 47. Unlike the Hispanic homeowners, Soto did not file a complaint concerning the harassment that occurred in 1999, 2005 or 2008 before the statute of limitations period expired.

Soto also was unable to work on his projects between August 2005 and spring 2006, due to the city's refusal to review them. *Id.* at ¶¶ 27-30. In writing a detailed letter to the city planner complaining that he was treated differently and was suffering significant damages, he said, "I am asking again for you to refrain from discriminatory treatment of [my company's] requests." *Id.* at ¶ 27; Exh. E. Soto, though, did not take timely action against the city. Another example of a distinct injury that Soto allegedly sustained, for which he did not seek timely redress, arose from his purchase of the property at 872 Sterling Avenue in 2003. Kalchbrenner told him the lot was buildable and his plans for the property complied with local zoning ordinances. *Id.* at ¶ 21. Based upon those assurances, he purchased the property only to be informed later that a home could not be built on the lot. *Id.* at ¶¶ 22-23. Though distinct and discoverable, Soto did not file a complaint prior to the expiration of the statute of limitations in 2005.

The distinct racial statements of Barmantje and Pineda on May 10, 1999, May 5, 2005 and May 29, 2009 do not tie together the allegations of the complaint into a pattern of conduct. *Id.* at ¶¶ 11, 26, 54. Rather, Soto knew or had reason to know of his alleged injuries much earlier than the date he filed his complaint. Soto's claims based upon the incidents between May 10, 1999 and May 27, 2008 are barred by the two-year statute of limitations. In light of this decision, the court does not consider whether Soto alleged plausible claims for relief concerning these incidents that satisfy the *Iqbal* standard.

11

## IV. Incidents Within Statute of Limitations Period

Soto alleges that on March 20, 2009, Nooden, a city inspector, required him to submit plans showing the location of gas service to 1216 Bishop Street, where he was building a home. Compl. at ¶ 50. He was not required to do so with respect to 40 homes he had previously built in the city. *Id.* at ¶ 51. In complying, he submitted four separate plans, incurred additional surveyor fees and lost the contracted buyer due to a resultant four-month delay in construction. *Id.* at ¶ 52. Similarly, on May 1, 2009, Soto received violation notices on six of his properties for failing to maintain grass and weed levels below eight inches. *Id.* at ¶ 56. Six months later, the six properties were in need of mowing again. *Id.* at ¶ 58. Though Soto arranged with Fincham to have the properties mowed by September 14, 2009, the city mowed the properties on September 13, 2009 at a cost of $1,170. *Id.* at ¶¶ 58-60. Soto generally asserts that due to his national origin, the city enforced zoning ordinances and issued the mowing violation notices in a different manner than against others. *Id.* at ¶¶ 60, 62.

Applying the Supreme Court's plausibility standard for pleading, this court cannot reasonably infer that the city is liable to Soto for requiring him to show a gas line on building plans and issuing mowing violation notices to him. *Iqbal*, 129 S. Ct. at 194. With respect to his equal protection claim, Soto has not shown that the city's actions had a discriminatory effect and were motivated by a discriminatory purpose. *Chavez v. The Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). While Soto is a member of a protected class, he does not show discriminatory effect by either naming specific individuals or using statistical evidence to demonstrate that similarly-situated members of an unprotected class were allowed to use building

plans without showing the gas line or maintain grass above eight inches.[3] *Id.* at 636. Soto also does not show that the city acted with a discriminatory purpose in enforcing the two ordinances. *Id.* at 645 (a discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group") (quoting *McClesky v. Kemp*, 481 U.S. 279, 298, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979))).

The complaint is unclear as to whether Soto seeks relief under the Fair Housing Act for the March 20, 2009 and May 1, 2009 incidents. Compl. at ¶¶ 74, 76. Even if he is, the city's requirement that Soto comply with two ordinances does not constitute a Fair Housing Act violation. The city did not discriminate "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities" on the basis of Soto's national origin. 42 U.S.C. § 3604(b). There also has been no showing that persons outside of Soto's protected class were allowed to utilize building plans without showing the gas line or were not issued mowing violation notices. *Scialabba v. Sierra Blanca Condominium Number One Ass'n*, No. 00 C 5344, 2001 WL 803676, at *3 (N.D. Ill. July 16, 2001) (Conlon, J.).

Soto contends he suffered mental anguish and embarrassment on May 29, 2009, as a result of Pineda saying to Chassee, "I didn't know they allowed Mexicans in here" and Chassee laughing in response while walking past Soto at a city restaurant. Compl. at ¶ 54. Racially

---

[3]Soto states, "[n]otably absent from these properties were the properties at 872 Sterling Ave. and 880 Sterling Ave., where the grass and weeds had grown to approximately four feet high." Compl. at ¶ 56. It is unclear from the record evidence whether Soto owned these properties. Even if he was not the owner, Soto fails to allege that members of an unprotected class owned them for purposes of showing discriminatory effect.

13

derogatory statements are reprehensible. While they may be evidence of racial animus, the statements do not violate the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). Based upon the foregoing, Soto fails to state a plausible Equal Protection Clause or Fair Housing Act claim upon which relief may be granted with respect to the March 20, 2009, May 1, 2009 and May 29, 2009 events. The remaining arguments in defendants' motion to dismiss are not considered.

## CONCLUSION

For the reasons set forth above, the motion to dismiss is granted.

ENTER:

_Suzanne B. Conlon_
Suzanne B. Conlon
United States District Judge

November 19, 2010